UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANGELIC NALUBEGA,            )
                                        )
            Plaintiff,         )
    v.                      )     CIVIL ACTION
                                          )     NO. 12-10124-JGD
CAMBRIDGE HOUSING        )
AUTHORITY,                )
                                        )
           Defendant.      )

**MEMORANDUM OF DECISION AND ORDER
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

September 30, 2013

DEIN, U.S.M.J.

## I.  INTRODUCTION

The plaintiff, Angelic Nalubega ("Nalubega"), has brought this action against the

defendant, Cambridge Housing Authority ("CHA"), seeking to reverse CHA's decision to

terminate Nalubega from the Section 8 Housing Choice Voucher Program.  CHA

terminated Nalubega's Section 8 housing voucher in 2011, after it determined that she

had allowed her boyfriend, Jason Monteiro ("Monteiro") to live in her apartment and to

engage in drug dealing from the apartment.  By her complaint, Nalubega has asserted a

claim for relief in the nature of certiorari, pursuant to Mass. Gen. Laws ch. 249, § 4,

alleging that the defendant committed errors of law in connection with its decision to

terminate her Section 8 benefits, and that its decision was not supported by substantial

evidence in the record (Count I).  In addition, Nalubega has asserted a claim against

CHA, pursuant to 42 U.S.C. § 1983, by which she alleges that the defendant's actions in connection with the termination proceedings deprived her of her constitutional right to procedural due process (Count II).

The matter is presently before the court on "Plaintiff Angelic Nalubega's Motion for Summary Judgment" (Docket No. 29) and on the "Defendant's Motion for Summary Judgment" (Docket No. 30).  By their motions, each of the parties is seeking summary judgment in its favor on both Counts of Nalubega's complaint.  After careful consideration of the record and a thorough review of the parties' extensive and deftly presented arguments, this court finds that there are no genuine issues of material fact and that CHA is entitled to judgment as a matter of law on each of Nalubega's claims.  Therefore, and for all the reasons detailed below, the plaintiff's motion for summary judgment is DENIED and the defendant's motion for summary judgment is ALLOWED.

## II.  <u>STATEMENT OF FACTS</u>[1]

The following facts are undisputed unless otherwise indicated.

### <u>The Section 8 Program</u>

As described above, this litigation arose as a result of CHA's decision to terminate

Nalubega's participation in the Section 8 Housing Choice Voucher Program (the "Section

8 Program").  The Section 8 Program was established by Congress pursuant to the

Housing and Community Development Act of 1974 in order to provide housing

assistance to low-income families.[2]  <u>See</u> 42 U.S.C. § 1437f;  <u>Langlois v. Abington Hous.</u>

<u>Auth.</u>, 234 F. Supp. 2d 33, 38 (D. Mass. 2002).  The Program is generally administered

---

[1]  The facts are derived from the following materials: (1) Plaintiff Angelic Nalubega's Statement of Undisputed Material Facts (Docket No. 29-2) ("PF"); (2) the exhibits attached to the Declaration of Evan D. Panich in Support of Plaintiff Angelic Nalubega's Motion for Summary Judgment (Docket No. 29-3) ("Pl. Ex. __"); (3) the Affidavit of Plaintiff Angelic Nalubega in Support of her Motion for Summary Judgment" (Docket No. 29-44) ("Nalubega Aff."); (4) the Affidavit of Elizabeth Blake (Docket No. 29-45) ("Blake Aff."); (5) the exhibits attached to the Memorandum of Law in Support of Defendant Cambridge Housing Authority's Motion for Summary Judgment (Docket No. 32) ("Def. Ex. __"); (6) the Defendant Cambridge Housing Authority's LR 56.1 Statement of Material Facts as to Which There is no Genuine Issue to be Tried (Docket No. 33) ("DF"); (7) the Defendant Cambridge Housing Authority's Response to Plaintiff Angelic Nalubega's Statement of Undisputed Material Facts (Docket No. 36) ("DR"); (8) Plaintiff Angelic Nalubega's Response to Defendant's Statement of Undisputed Material Facts (Docket No. 39) ("PR"); and (9) the exhibits attached to the Second Declaration of Evan D. Panich in Support of Plaintiff Angelic Nalubega's Motion for Summary Judgment (Docket No. 43) ("Pl. Supp. Ex. __").  As detailed in this court's Memorandum of Decision and Order on Defendant's Motion to Strike issued on this date, this court has denied the plaintiff's motion to strike portions of the Affidavit of Plaintiff Angelic Nalubega in Support of her Motion for Summary Judgment.  Therefore, this court has considered that Affidavit in its entirety.

[2]  "A '[f]amily' is a 'person or group of persons' approved to reside in a unit with Section 8 assistance.  24 C.F.R. § 982.4(b).  Thus, references in the [Housing and Urban Development] regulations to a recipient 'family' cover individual recipients like [Nalubega]."  <u>Costa v. Fall River Hous. Author.</u>, 453 Mass. 614, 617 n.6, 903 N.E.2d 1098, 1104 n.6 (2009).

by State or local public housing authorities ("PHAs").  24 C.F.R. § 982.1(a)(1).  To

participate in a Section 8 Program, low-income families seeking assistance may apply to a

PHA.  <u>Langlois</u>, 234 F. Supp. 2d at 39.  Once approved, eligible participants are awarded

subsidies, in the form of vouchers, which the participants may then use to rent an eligible

housing unit in the private rental market.  <u>Id.</u> (DF ¶ 1).  "A Section 8 family conveys its

voucher together with the family's previously determined rent contribution – generally

about 30% of its income – to the landlord, who in turn forwards the voucher to the PHA

for the remainder of the rent."  <u>Langlois</u>, 234 F. Supp. 2d at 39.  The PHA then receives

reimbursement from the United States Department of Housing and Urban Development

("HUD").  <u>Id.</u>

Families participating in the Section 8 Program must comply with the obligations

listed in the HUD regulations set forth in 24 C.F.R. § 982.551.  Significantly, those

regulations include obligations relating to the use and occupancy of the housing unit and

obligations to refrain from engaging in certain criminal activity.  <u>See</u> 24 C.F.R. §§

982.551(h), 982.551(l).  With respect to use and occupancy, the regulations provide in

relevant part as follows:

> (h) Use and occupancy of unit–
>
>                       \* \* \*
>
> > (2) The composition of the assisted family residing in the unit must be approved by the PHA.  The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child.  *The family must request PHA approval to add any other family member as an occupant of the unit.  No other person [i.e., nobody but members of the assisted family] may reside in the unit*

4

>            (except for a foster child or live-in aide as provided in paragraph
>            (h)(4) of this section).

24 C.F.R. § 982.551(h)(2) (emphasis added).  With respect to the family's obligation to

refrain from criminal activity, the regulations provide:

>            (l) Crime by household members.  The members of the household
>            may not engage in drug-related criminal activity or violent criminal
>            activity or other criminal activity that threatens the health, safety, or
>            right to peaceful enjoyment of other residents and persons residing in
>            the immediate vicinity of the premises (see § 982.553)....

24 C.F.R. § 982.551(l).

The regulations further authorize PHAs administering the Section 8 Program to

terminate assistance to a family that violates any of its obligations under the Program.

24 C.F.R. § 982.552(c)(1)(i).  As described below, the parties dispute whether these

regulations supported CHA's decision to terminate Nalubega's Section 8 benefits.

### CHA's Administration of the Section 8 Program

The defendant, CHA, is a Massachusetts PHA, which administers the Section 8

Program at the local level.  (DF ¶ 1; PF ¶ 2).  In that capacity, CHA is responsible for

processing applications, making determinations as to eligibility, and enforcing the

requirements of Section 8.  (DF ¶ 1).  It is also responsible for making decisions to

terminate participants from the Program, and for handling appeals from such decisions.

(PF ¶ 4).

Under the applicable HUD regulations, CHA is required to adopt "a written

administrative plan that establishes local policies for administration of the [Section 8

Program] in accordance with HUD requirements" and regulations.  24 C.F.R. §

982.54(a)-(b).  Although CHA has recently rewritten its administrative plan, it is

undisputed that its 1998 Administrative Plan (the "1998 Plan") was in effect at the time

of the events giving rise to Nalubega's claims, and is the relevant Plan for purposes of

this litigation.  (See PF ¶¶ 8-10, 13-14; DR ¶¶ 8-10, 13-14).  It is also undisputed that

under the 1998 Plan, CHA was authorized to terminate a family's participation in the

Program based on the family's failure to comply with its obligations under 24 C.F.R.

§ 982.551.  (PF ¶ 10).  Thus, pursuant to the 1998 Plan, CHA could terminate the

family's participation if any member of the household engaged in drug-related criminal

activity.  See 24 C.F.R. § 982.551(l).  Moreover, CHA was authorized to terminate a

family's participation in the Section 8 Program if anyone other than members of the

assisted family was residing in the unit.  See 24 C.F.R. § 982.551(h)(2).  It is undisputed,

however, that the 1998 Plan contained no specific limitation on an overnight guest's

length of stay at a Section 8 housing unit.  (PF ¶ 11; DR ¶ 11).  Therefore, it did not

specify when a participant's guest became an occupant of the unit for purposes of Section

8.

The 1998 Plan included a section entitled "Appeal Procedure" under which any

participant who considered himself or herself to have been aggrieved by any conduct of

CHA was entitled to an informal hearing before a Conference Panel made up of three

members, including a public housing tenant, a CHA employee, and a member of the CHA

Board of Commissioners, who would also serve as the Chairman of the Conference

6

Panel.  (<u>See</u> PF ¶ 12; DR ¶ 12; Pl. Ex. 4 at 22-24).  Because the Conference Panel hearings were intended to be conducted informally, the Plan provided that they were not subject to any formal rules of evidence.  (Pl. Ex. 4 at 24).  Nevertheless, the grieving party was entitled to be represented by counsel or another individual of that party's choice, and to present oral and written evidence at the hearing.  (<u>Id.</u>).

The responsibility of the Conference Panel hearing an appeal was "to determine, in light of the information that is available . . . , whether the [underlying] decision of the [CHA] staff is reasonable and supportable, and in conformity with [the] plan and other applicable law."  (<u>Id.</u> at 22).  In addition, the Conference Panel was required to issue a written decision "which shall contain a statement of evidence relied on and the reasons supporting its decision."  (<u>Id.</u>).  As detailed below, Nalubega appealed the CHA staff's decision to terminate her participation in the Section 8 Program pursuant to these procedures.  As issue is whether CHA provided her adequate due process in connection with that appeal.

## Nalubega's Participation in the Section 8 Program

Nalubega qualified for low-income rental assistance and began participating in CHA's Section 8 Program in June 2008.  (PF ¶¶ 15-16; DR ¶ 15).  Using the voucher she received from CHA, Nalubega rented a one-bedroom apartment located at 12 Harding Street in Cambridge, Massachusetts.  (PF ¶ 17; DR ¶ 17).  In October 2008, while she was living at 12 Harding Street, the plaintiff discovered that she was pregnant with Monteiro's child.  (Nalubega Aff. ¶ 7).  It is undisputed that Monteiro was not listed on

7

Nalubega's lease as a fellow tenant or occupant of the apartment, and was not an authorized member of Nalubega's family for purposes of the Section 8 Program.  (See DF ¶¶ 3, 12; PR ¶ 12; Pl. Mem. (Docket No. 29-1) at 8).

In June 2011, CHA terminated Nalubega's participation in the Program.  (PF ¶ 18).  The defendant's decision was based upon information that it received about a police raid that occurred at Nalubega's apartment in February 2009 and led to drug-related charges against Monteiro and the plaintiff.  The following describes the relevant details of that incident.

### The February 27, 2009 Incident

The incident involving a police raid on Nalubega's apartment occurred on February 27, 2009.  (DF ¶ 2; PR ¶ 2).  At some point prior to 8:00 a.m. that day, various members of the Special Investigations Unit of the Cambridge Police Department executed a search warrant at Nalubega's 12 Harding Street residence.  (Def. Ex. L at 1).  When the police entered the apartment, they found both Nalubega and Monteiro inside.  (Id.).  They also found marijuana and over 23 grams of cocaine at the premises.  (Id.).

According to the police Incident Report, which was written by one of the officers who had been at the scene and participated in the search, the police informed both Nalubega and Monteiro that they had a warrant to search the apartment.  (Id. at 1-2). They also informed Monteiro that they had a warrant to conduct a search of his person. (Id. at 2).  After both individuals were read their Miranda rights, the officers proceeded to

conduct their search of the plaintiff's residence, which included a search of the plaintiff's bedroom, livingroom and kitchen.  (Id.).

The Incident Report indicates that during their search of the bedroom, police officers found a plastic bag containing 5 individually wrapped bags of marijuana "in plain view on the floor beside the television."  (Id.).  The officers also found, among other items, a compact disc on top of the television with loose marijuana sitting on it.  (Id.). Moreover, during a search of the bedroom closet, one of the officers discovered individually wrapped bags of cocaine and marijuana located inside a large bag of infant clothing.  (Id.).

In addition to the drug-related evidence, the police reportedly found a number of personal items belonging to Monteiro in the course of their search of the bedroom.  Those items included a pair of Monteiro's trousers, a copy of his Massachusetts identification card, and a cell phone bill in Monteiro's name with an address of 12 Harding Street. (Id.).  Additionally, the police discovered a set of keys to 12 Harding Street inside one of the pockets of Monteiro's trousers.  (Id.).

After the officers searched the bedroom, they proceeded to search the livingroom and kitchen areas of Nalubega's apartment.  (Id.).  According to the Incident Report, the officers discovered a digital scale, 2 boxes of plastic baggies, and a box cutter razor blade located on a card table in the livingroom.  (Id.).  Their search of the livingroom also revealed the presence of a cell phone, charger, and "numerous boxes of sandwich bags." (Id.).  During their search of the kitchen area, the police reportedly discovered a second

9

digital scale, a prescription bottle of medication in Monteiro's name, and a document from the Cambridge District Court, again in Monteiro's name, inside a kitchen drawer. (Id.). There is no indication whether an address was written on Monteiro's prescription bottle or on the document from the District Court. (Id.). However, the officer who completed the Incident Report listed Monteiro's address as "Howard St. Cambridge MA" on the front of the Report, in contrast to Nalubega's address, which was listed as "12 Harding St. Cambridge MA." (Id. at 1).

After completing their search of the plaintiff's housing unit, the police reportedly seized "[o]ver 23 grams of cocaine and an amount of marijuana, as well as drug packaging[,]" as evidence. (Id.). Also "[s]eized as evidence of custody and control of 12 Harding Street [were] personal papers and documents in the name of Jason Monterio (sic) and Angelic Nalubega." (Id. at 2). In addition, Monteiro was placed under arrest and was charged with various drug offenses, including possession with intent to distribute marijuana, trafficking in cocaine, and drug violations near a school. (DF ¶ 2; PR ¶ 2). Nalubega was charged with the same crimes, but was not arrested due to her pregnancy. (Id.).

Ultimately, Monteiro was convicted and incarcerated on charges stemming from the raid on Nalubega's apartment. (Id.). However, in August 2009, the prosecutor entered a nolle prosequi in the Commonwealth's case against Nalubega. (PF ¶ 32). Accordingly, the plaintiff was never prosecuted, and all of the charges against her were dismissed.

### Nalubega's Receipt of Pre-Termination Notice

On October 28, 2010, twenty months after the incident at Nalubega's apartment, the plaintiff received a Pre-Termination Notice from Yuen Ting Tang Wu, the Deputy Director of Leased Housing at CHA, notifying her of the defendant's intent to terminate her participation in the Section 8 Program on October 31, 2010.  (PF ¶ 34; Def. Ex. A at 1).  Therein, CHA informed the plaintiff that "Federal Regulations at 24 CFR 982.552 permits termination of Section 8 assistance 'if the family violates any family obligations under the program.'  The CHA intends to terminate your participation on 10/31/2010 based on Federal Regulations at 24 CFR 982.551-982.553."  (Def. Ex. A at 1 (emphasis omitted)).  The defendant also marked off boxes with an "X" next to the following violations: "Illegal Occupant," "Violent Behavior Related Activity," "Fraud," and "Illegal Drug Related Activity[.]" (Id.).  Moreover, it described the alleged violations in a brief summary as follows:

> Summary: This office has been notified that you are in violation of the obligations of the program, including having illegal occupants in your unit, engaged illegal drug related and violent behavior related activities.

(Id.).

The defendant attached various documents to Nalubega's Pre-Termination Notice. Those documents included copies of the HUD regulations cited in the Notice; a police Incident Report dated October 30, 2007 regarding a charge of an assault with a dangerous weapon against Nalubega; a copy of the police Incident Report from the February 27,

2009 police raid on Nalubega's apartment; and a Booking Report describing Monteiro's arrest on February 27, 2009, as well as the charges that had been brought against him. (Id. at 3-7, 9-11, 13-14).  The Booking Report listed Monteiro's address as "12 Harding St." in Cambridge.  (Id. at 11).

The Pre-Termination Notice advised Nalubega of her "right to request a conference panel to appeal CHA'[s] decision by submitting a written request . . . within five (5) days from the date of this notice," and informed her of her "right to be represented at the conference panel and to make such response as you wish."  (Id. at 1-2).  It further advised her of the right to examine the documents available in her file, and provided her with information on how to contact legal service providers.  (Id. at 2).  On November 4, 2010, Nalubega submitted a written Request for Hearing in which she stated that she wished to have a hearing before a conference panel in order "to explain everything that has happened in [the] apartment" and "to explain that I am not responsible for all this [viol]ation."  (Def. Ex. C).

The defendant has submitted correspondence showing that on January 25, 2011, following CHA's receipt of Nalubega's Request for Hearing, Nalubega attended an informal conference with Angelica Benzan, CHA's Director of Leased Housing, to discuss the basis for CHA's decision to terminate her participation in the Section 8 Program, and to give the plaintiff an opportunity to provide CHA with additional information.  (Def. Exs. D-E).  Following the conference, CHA hand delivered a document to the plaintiff, entitled "Summary of Informal Conference," in which Ms.

Benzan informed the plaintiff of CHA's intent to go forward with the termination of her

housing benefits as a result of the incident that occurred on February 27, 2009.  (Def. Ex.

E).  As Ms. Benzan stated,

> CHA intends to terminate your participation in review of the incident
> on 2/27/2009.  The police executed a search warrant and found drugs
> in the unit.  You were later summoned to court and charged with
> possession of illegal drugs.  You are in serious violation of program
> rules and federal regulations (see attached).  As you have engaged
> [i]n criminal activity of a drug related nature and also had an illegal
> occupant residing with you that engaged in criminal activity up to
> possession and distribution of illegal substances.

(Id.).  Nalubega claims that she has no memory of attending the conference or receiving

the Summary of Informal Conference.  (Nalubega Aff. ¶ 20).  However, she has not

presented any specific facts to show that the conference did not occur.

### The April 25, 2011 Conference Panel Hearing

On April 22, 2011, CHA sent Nalubega a notice to inform her that a Conference

Panel Hearing regarding her appeal of the termination decision had been scheduled for

April 28, 2011.  (PF ¶ 41).  Subsequently, however, CHA changed the date of the hearing

to April 25, 2011.  (See PF ¶ 42; Nalubega Aff. ¶ 22).  Accordingly, Nalubega had only

two days from the scheduling of the hearing to prepare for her appeal.  (PF ¶ 43; DR ¶

43).  Moreover, because Nalubega's efforts to retain legal counsel on such short notice

were unsuccessful, the plaintiff was not represented by counsel at the hearing.  (See

Nalubega Aff. ¶¶ 24-26; PF ¶ 46; DR ¶ 46).  The plaintiff claims that just prior to the start

of the hearing, she asked Ms. Benzan for a postponement so that she could find a lawyer,

but that Ms. Benzan denied her request.  (Nalubega Aff. ¶ 27).  The defendant denies that any continuance was requested, but has submitted no evidence to substantiate its position.  (See PF ¶ 47; DR ¶ 47).

The hearing took place on April 25, 2011 as scheduled before a Conference Panel consisting of Gerard Clark, the Chairman of CHA's Conference Panel Committee and the Chairman of the Board of Commissioners of CHA, Nancy Harranda from CHA, and Madeline Farrell, a public housing tenant of CHA.  (PF ¶ 48; DF ¶ 14).  Mr. Clark presided over the hearing as Chairman of Panel.  (PF ¶ 52).  During the hearing, Ms. Benzan presented evidence in support of CHA's decision to terminate Nalubega's participation in the Section 8 Program.  (Pl. Ex. 32).  In particular, Ms. Benzan testified that the decision was based on information regarding the February 27, 2009 police raid at Nalubega's apartment, and she provided details of the incident, including the findings described by the police in the Incident Report.  (Id.).  According to Ms. Benzan, the information contained in the Incident Report showed that an unauthorized male had been permanently residing in Nalubega's housing unit, and that illegal drug activity had occurred there as well.  (Id.).  Although she acknowledged that a nolle prosequi had been filed in the Commonwealth's criminal case against Nalubega, and that Nalubega denied having had any contact with Monteiro since the time of the incident, Ms. Benzan stated that CHA was moving to terminate the plaintiff's benefits based on Monteiro's drug-related activity in the Section 8 unit and Nalubega's awareness of that activity.  (Id.).

14

Following Ms. Benzan's presentation, Nalubega provided testimony in which she denied having any knowledge of drugs in the apartment, and denied Ms. Benzan's assertion that Monteiro had been living there.  (Id.).  The plaintiff explained that Monteiro had been assisting her due to complications with her pregnancy, but that his residence was in Boston and not at her apartment in Cambridge.  (Id.).  She also stated that she was working and going to school every day, and had never seen drugs in the apartment.  (Id.).

In addition to the testimony of the plaintiff and Ms. Benzan, various written materials were submitted as evidence to the Conference Panel.  (DF ¶ 8; PR ¶ 8).  Those materials consisted of the plaintiff's Request for Hearing; the January 25, 2011 Summary of Informal Conference; copies of various HUD regulations pertaining to the Section 8 Program; copies of the police Incident Report of the February 27, 2009 drug raid at Nalubega's apartment; a copy of Monteiro's Booking Report relating to his arrest on February 27, 2009; a copy of the police Incident Report concerning the charge of assault with a dangerous weapon against Nalubega on October 30, 2007; and copies of criminal dockets from the Cambridge District Court, which pertained to the drug-related charges that had been brought against the plaintiff as a result of the February 27, 2009 incident, and included a copy of the nolle prosequi that had been entered with respect to those charges.  (Id.).

At the conclusion of the hearing, the Conference Panel issued a written decision

affirming the decision to terminate Nalubega's participation in the Section 8 Program.

(Def. Ex. H).  The decision, which was authored by Chairman Clark, provided as follows:

> Case summary: This is an appeal of a staff decision terminating a
> Housing Choice Voucher.  The basis for the termination was the fact
> that the Housing Choice Voucher holder allowed an unauthorized
> guest to inhabit the unit and then to deal illegal drugs from the unit.
> The unit was raided by the Cambridge police with a search warrant
> and the records indicate extensive drug and paraphernalia
> possession.  The participant who has one young child claims that she
> did not know that this dealing was going on from her unit.  In review
> of the police report there was a search of the unit and there was mail
> list[ing] the boyfriend['s] name and the participant address.  The
> participant stated she had no knowledge of the ex-boyfriend[']s
> whereabouts currently.  The panel did not believe this testimony.
>
> Accordingly, the staff decision [to terminate] is affirmed.

(Def. Ex. H; Pl. Ex. 28 at 165).

### The November 16, 2011 Conference Panel Hearing

Following the conclusion of the April 25, 2011 Conference Panel hearing,

Nalubega obtained legal assistance from Harvard Law School's Tenant Advocacy Project

("TAP").  (Nalubega Aff. ¶¶ 24, 31).  Thereafter, Nalubega's legal representative,

Rachelle Rubinow, sent a letter to CHA in which she requested that Nalubega be granted

a new hearing.  (DF ¶ 10).  As Ms. Rubinow explained in her letter,

> Ms. Nalubega attended the hearing [on April 25] and requested a
> continuance explaining that she could not find representation.
> However, her request for continuance was denied.  She went forward
> with the hearing without representation so she would not be
> defaulted.  The Conference Panel ruled against her.  We submit that
> if she had representation, she would have been able to present

16

> stronger evidence.  For example, one of the criminal charges that
> served as the basis for her termination was *nolle prossed* in August,
> 2009.

(DF ¶ 10 (emphasis omitted)).

CHA granted Nalubega's request and a new hearing took place on November 16, 2011 before a Conference Panel consisting of Tracy Harriott, an employee of CHA, Joe Ellis, a public housing tenant of CHA, and Gerard Clark, who again acted as Chairman for purposes of the hearing.  (DF ¶ 14; PR ¶ 14; PF ¶¶ 51-52).  Although CHA provided no specific guidance regarding the purpose and scope of the hearing, it is undisputed that the defendant placed no evidentiary restrictions on the plaintiff or limited her ability to present whatever information she deemed relevant to the termination decision.  (PF ¶ 54; DF ¶ 14).  Nalubega was represented at the hearing by Ms. Rubinow from TAP. (Nalubega Aff. ¶ 34; DF ¶ 11).

During the November 2011 hearing, Ms. Benzan again presented the basis for CHA's decision to terminate Nalubega's participation in the Section 8 Program, as well as the basis for the April 25 Conference Panel's decision to uphold the termination.  (PF ¶ 55).  She explained that CHA's decision was based on the Incident Report of the February 27, 2009 police raid on the plaintiff's apartment, which revealed the presence of an illegal occupant and drug activity in the residence.  (Pl. Ex. 33).  Ms. Benzan also described the contents of the Incident Report, including the description of the drugs and drug paraphernalia found in the apartment, and information regarding the discovery of Monteiro's personal effects in the housing unit.  (Id.).

17

Following Ms. Benzan's testimony, Nalubega had an opportunity to rebut the defendant's evidence.  (Id.).  The plaintiff testified that Monteiro was the father of her child, but denied that he had been living in her apartment.  (Id.).  Specifically, she explained that Monteiro had slept over on the night before the police raid so that he could help her with errands and other household tasks, and she insisted that she had never allowed him to use her mailing address.  (Id.).  Nalubega further testified that she had no knowledge of any drugs in her housing unit, and she stated that she had not seen or heard from Monteiro since her daughter's first birthday.  (Id.).  At the conclusion of her testimony, Nalubega told the Conference Panel that she had been staying at her mother's house since losing her Section 8 benefits.  (Id.).  She also stated that her mother's house was overcrowded, that she was sleeping on the floor, and that the conditions there were inappropriate for her young daughter.  (Id.).

Following Nalubega's testimony, the Conference Panel heard statements from two witnesses who testified in support of Nalubega.  (Id.; PF ¶ 55).  They also heard oral argument from the plaintiff's legal representative, Ms. Rubinow, who described why the Panel should reverse the decision to terminate Nalubega's benefits.  (Pl. Ex. 33).  However, after the hearing concluded, the Conference Panel re-affirmed the CHA staff's decision to terminate in a written decision that was authored by Gerard Clark.  (PF ¶ 55; DF ¶ 11).  The substance of that decision read:

> This is the report of a re-hearing of the appeal of the termination of a Housing Choice Voucher.  The re-hearing was granted by the Executive Director based on a claim that the voucher holder was not

18

> represented by counsel at the original hearing.  The only new evidence offered was the testimony of two friends who attested to the voucher holder's good character.  The voucher holder repeated her protestations that she did not know that Mr. Monteiro, the father of her only child, was convicted of dealing drugs out of her apartment, based upon drugs and paraphernalia found in the apartment and seized by the police.  The panel did not believe her testimony at the last hearing and did not believe it this second time. The termination of her housing choice voucher is re-affirmed.

(Def. Ex. J).

Two months after the second Conference Panel issued its decision to uphold the termination decision, Nalubega, with the aid of counsel, filed the instant case in Suffolk Superior Court.  (PF ¶ 60).  CHA removed the matter to this court on January 20, 2012. (PF ¶ 61).[3]

Additional factual details relevant to this court's analysis are provided below where appropriate.

## III.  ANALYSIS

### A.  Summary Judgment Standard of Review

Summary judgment is appropriate when the moving party shows, based on the discovery and disclosure materials on file, and any affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"  Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (quoting

---

[3]  This court allowed plaintiff's motion for appointment of counsel on April 19, 2012.

Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)).  "A fact is material only if it possesses the capacity to sway the outcome of the litigation under the applicable law." Id. (quotations, punctuation and citations omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact.  See Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010).  If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial.  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  Accordingly, "the nonmoving party 'may not rest upon mere allegation or denials of his pleading[,]'" but must set forth specific facts showing that there is a genuine issue for trial.  Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)).  "Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed."  Adria Int'l Group, Inc. v. Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001).  "'When facing cross-motions for summary judgment, a court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56.'"  Ford v. Clarke, 746 F. Supp. 2d 273, 285 (D. Mass. 2010) (quoting Dan Barclay, Inc. v. Stewart & Stevenson Servs., Inc., 761 F. Supp. 194, 197-98 (D. Mass. 1991)).  Applying this standard to the undisputed evidence in the instant case supports the conclusion that

CHA's motion for summary judgment should be allowed and that Nalubega's motion for summary judgment should be denied.

### B.      Count I: Claim in the Nature of Certiorari

In Count I of her complaint, Nalubega has asserted a claim under Mass. Gen. Laws ch. 249, § 4, "which provides for review in the nature of certiorari to correct claimed errors of law apparent on the record made in proceedings . . . not otherwise reviewable[.]"  Durbin v. Bd. of Selectmen of Kingston, 62 Mass. App. Ct. 1, 4-5, 814 N.E.2d 1121, 1126 (2004).  Nalubega claims that CHA committed errors of law in connection with its decision to terminate her participation in the Section 8 Program, and that its decision was not based on substantial evidence in the record.  For the reasons detailed below, this court finds that the decision was both legally tenable and supported by substantial evidence.  Therefore, CHA is entitled to summary judgment with respect to this claim.

### Certiorari Standard of Review

"The relief sought in an action in the nature of certiorari is to correct substantial errors of law *apparent on the record* adversely affecting material rights" of the plaintiff. Id. at 5, 814 N.E.2d at 1126 (emphasis in original) (quotations and citations omitted). Accordingly, "[the court's] function in reviewing an appeal of a decision in a certiorari proceeding is a limited one."  Id.  The reviewing court must confine its review to the administrative record and determine "whether the [agency's] decision was legally tenable and supported by substantial evidence on the record as a whole."  Bielawski v. Pers.

Adm'r of Div. of Pers. Admin., 422 Mass. 459, 464, 663 N.E.2d 821, 826 (1996)

(quotations and citations omitted).  "[A] court may not set aside [an agency] decision, not

otherwise legally erroneous, that is supported by substantial evidence."  Lisbon v.

Contributory Ret. Appeal Bd., 41 Mass. App. Ct. 246, 257, 670 N.E.2d 392, 400 (1996).

"Judicial review under the substantial evidence standard is circumscribed" and

"highly deferential to the agency[.]"  Id. (quotations and citations omitted).  Under that

standard, the court must uphold the agency's decision as long as it is based on "reason-

able evidence" – that is, "such evidence as a reasonable mind might accept as adequate to

support a conclusion, after taking into consideration opposing evidence in the record."

Id. (quotations and citations omitted).  Thus,

> [u]nder the substantial evidence test, the reviewing court is not
> empowered to make a de novo determination of the facts, to make
> different judgments as to the credibility of witnesses, or to draw
> different inferences from the facts; it cannot disturb a choice made
> below between two fairly conflicting inferences or views of the
> facts, even if it might justifiably make a different choice were the
> case before it de novo.

Durbin, 62 Mass. App. Ct. at 6, 814 N.E.2d at 1127.

### **Alleged Failure to Define Unauthorized "Guests" or "Occupants"**

Nalubega argues that the Conference Panel made a substantial error of law when it

decided to uphold the decision to terminate her Section 8 benefits on the grounds that she

allowed an unauthorized "guest" to live in her housing unit.  (Pl. Mem. (Docket No. 29-1)

at 6-7).  The plaintiff contends that because the 1998 Plan contained no restrictions on

guests, and did not define when a guest would become an unauthorized occupant of a

22

Section 8 housing unit, there was no legal basis for CHA's determination that termination was appropriate because "the Housing Choice Voucher holder allowed an unauthorized *guest* to inhabit the unit and then to deal illegal drugs from the unit." (See id.; Def. Ex. H (emphasis added)). It is true that the 1998 Plan lacked any provisions addressing the presence of "guests" or the length of time that a "guest" could visit the housing unit before becoming an unauthorized "occupant" of the unit.[4] (See generally Pl. Ex. 4; PF ¶ 11; DR ¶ 11). Nevertheless, the plaintiff's assertion that CHA therefore lacked a legal basis for its decision is without merit.

Although the written decision of the April 25 Conference Panel referred to Monteiro as a "guest," it is apparent from the language of the decision, as well as from the record as a whole, that the Conference Panel's decision was not based on Monteiro's presence as a guest in the apartment, but rather on his presence as an occupant of Nalubega's housing unit. Because both the HUD regulations and the 1998 Plan provide legal support for a decision to terminate based on evidence of an unauthorized individual living in the Section 8 housing unit, this court finds that CHA committed no legal error.

In its written decision, the Panel explained that the plaintiff had allowed an unauthorized guest, namely Monteiro, "to *inhabit* the unit" and then to engage in drug

---

[4] CHA's newly drafted Administrative Plan contains limitations on a guest's ability to stay overnight in a Section 8 housing unit. (See PF ¶ 13; DR ¶ 13; Pl. Ex. 7 § 9E). However, there is no dispute that it was the 1998 Plan that was in effect at the time of the events at issue in this lawsuit, and that the 1998 Plan does not contain any specific limitation on an overnight guest's length of stay in the unit. (See PF ¶¶ 8-11, 13-14; DR ¶¶ 8-11, 13-14).

dealing from the unit.  (Def. Ex. H (emphasis added)).  It further emphasized the fact that police had found "mail list[ing] the boyfriend['s] name and the participant address" during their search of the apartment.  (Id.).  Moreover, throughout the course of the termination and appeal proceedings, CHA maintained that the plaintiff had violated her obligations under the Section 8 Program by, among other things, allowing an unauthorized individual to reside in and occupy her unit.  For example, in its Pre-Termination Notice, CHA informed Nalubega that "you are in violation of the obligations of the program, including having illegal occupants in your unit[.]"  (Def. Ex. A at 1).  Similarly, in its Summary of Informal Conference, CHA stated that it still intended to terminate her from the Program, based on the February 27, 2009 incident, because, among other things, she had allowed an "illegal occupant" to reside in her Section 8 unit. (Def. Ex. E).  Ms. Benzan later repeated these charges at the hearings before the Conference Panels, and referenced portions of the 2009 police Incident Report describing the discovery of Monteiro's personal items in Nalubega's apartment.  (Id.).  Therefore, the record demonstrates that CHA did not terminate the plaintiff due to the presence of a "guest" in her apartment, or on the grounds that Nalubega had allowed her guest to stay too long.  Instead it shows that CHA terminated Nalubega's voucher because she allowed Monteiro to live there.  Indeed, Nalubega acknowledged as much in the very first paragraph of her complaint, when she stated that "[t]he CHA terminated the Plaintiff's Section 8 rental subsidy in 2011 primarily because, it believed, that in February 2009, her then-boyfriend lived with her and engaged in alleged drug activity."  (Compl. ¶ 1).

It is undisputed that under the 1998 Plan, CHA had authority to terminate a family's participation in the Section 8 Program based on its failure to comply with its obligations under 24 C.F.R. § 982.551.  (PF ¶ 10).  Pursuant to section 982.551(h) of those regulations, no one other than "members of the assisted family . . . may reside in the [Section 8 housing] unit[.]"  24 C.F.R. § 982.551(h)(2).  The record establishes that Monteiro was not an authorized member of Nalubega's family for purposes of her participation in the Section 8 Program.  (See DF ¶¶ 3, 12; PR ¶¶ 3, 12; Pl. Mem. at 8).  Therefore, CHA had a legal basis for the termination.

The plaintiff suggests that the defendant could not have enforced the use and occupancy regulations against her in the absence of a specific guest policy defining the conditions under which a guest could be considered an unauthorized occupant.  (See Pl. Mem. at 6-7, 9).  However, she has not presented any legal support for such a claim.  The HUD regulations prohibiting non-family members from residing in a Section 8 housing unit do not specifically mention guests.  See 24 C.F.R. § 982.551(h)(2).  Moreover, while the HUD regulations addressing administrative plans require PHAs to adopt certain guidelines and policies, including occupancy policies that define "what group of persons may qualify as a 'family'" and "when a family is considered to be 'continuously assisted[,]'" they do not require PHAs to adopt policies regarding guests or visitors.  See 24 C.F.R. §§ 982.54(d)(4).  Accordingly, there is no basis to conclude that CHA lacked

25

legal authority to determine that Monteiro was an unauthorized occupant of her housing unit.[5]

## Substantial Evidence Regarding Monteiro's Occupancy

Nalubega also argues that even if CHA had the legal authority to terminate her housing assistance due to the presence of an unauthorized occupant, its determination that Monteiro was in fact an unauthorized occupant was not supported by substantial evidence in the record.  (Pl. Mem. at 9-11).  Again this court disagrees.  The record establishes that the Conference Panels, in upholding the decision to terminate Nalubega from the Section 8 Program, relied primarily upon the Incident Report of the February 27, 2009 drug raid at her apartment.  (See Def. Exs. H and J).  This court finds that the Incident Report provided substantial evidence to support a determination that Monteiro was living in the unit.

The Incident Report reveals that on February 27, 2009, the police were executing two search warrants at Nalubega's apartment – one for the apartment and one for Monteiro's person.  (Def. Ex. L at 1-2).  Therefore, the police expected to find both

---

[5]  The fact that CHA subsequently adopted a guest policy when it revised its Administrative Plan, or that other PHAs may have had such policies in place at the time Nalubega was terminated from the Section 8 Program, does not alter this court's conclusion that CHA had a legal basis for concluding that Monteiro was an unauthorized occupant.  As described above, HUD regulations specifically authorize PHAs to terminate assistance "[i]f the family violates any family obligations under the program[,]" including its obligation not to allow non-family members to reside in the unit.  24 C.F.R. § 982.552(c)(1)(i).  Therefore, CHA was legally justified in terminating the plaintiff's benefits on the grounds that Monteiro was living in her apartment.

Monteiro and evidence of drug dealing activities when they arrived at Nalubega's residence before 8:00 in the morning. The Incident Report also reveals that Monteiro was present in the apartment at the time the police arrived, and that the police discovered drugs and drug paraphernalia throughout the apartment. (Id.). Such evidence is consistent with the defendant's determination that Monteiro was using Nalubega's unit as his residence and was dealing drugs from that location.

The search of the apartment described in the Incident Report also supports the defendant's conclusion that Monteiro was an unauthorized occupant. According to the Report, the search uncovered various personal items belonging to Monteiro, including a pair of Monteiro's trousers containing keys to Nalubega's home, a cell phone bill in Monteiro's name with an address of 12 Harding Street, a prescription bottle of medication in Monteiro's name, and a document from the Cambridge District Court in Monteiro's name. (Id. at 2). Moreover, the police reportedly discovered the prescription bottle and the court document located inside a kitchen drawer. (Id.). This too is consistent with CHA's determination that Monteiro was living in the unit.

Finally, the Incident Report states that the police seized "personal papers and documents in the name of Jason Monterio (sic) and Angelic Nalubega" "as evidence of custody and control of 12 Harding Street[.]" (Id.). Based on this and the other evidence contained in the Incident Report, this court finds that it was reasonable for the defendant to conclude that Monteiro was an "unauthorized occupant."

Nevertheless, the plaintiff argues that the Incident Report is hearsay, and that it was improper for CHA to rely on the Report rather than on the underlying documents and other personal items described in the Report.  (Pl. Mem. at 9-11).  This argument is unpersuasive.  As an initial matter, both the 1998 Plan and the HUD regulations provide that termination hearings shall be informal and that the Conference Panel "shall not be bound by any formal rules of evidence."  (Pl. Ex. 4 at 24 ¶ E); 24 C.F.R. §§ 982.555(e)(1) (requiring PHAs to establish procedures for conducting "informal hearings for participants"), 982.555(e)(5) ("Evidence may be considered without regard to admissibility under the rules of evidence applicable to judicial proceedings").  Thus, "there is no categorical prohibition" on a PHA's use of hearsay.  Costa v. Fall River Hous. Author., 453 Mass. 614, 624-25, 903 N.E.2d 1098, 1109 (2009).

Moreover, "hearsay evidence may form the basis of a PHA's decision to terminate Section 8 assistance so long as that evidence contains substantial indicia of reliability." Id. at 627, 903 N.E.2d at 1110.  See also Gammons v. Mass. Dept. of Hous. & Cmty. Dev., 502 F. Supp. 2d 161, 165 (D. Mass. 2007) ("it is well established that hearsay evidence is admissible in administrative proceedings, where relevant").  This court finds that the police Incident Report was sufficiently reliable to support the defendant's termination decision.

The record establishes that the Incident Report was written by Officer Stephen Edwards, one of the officers who was at the scene and participated in the search of Nalubega's apartment.  (See Def. Ex. L at 1-2).  It was also reviewed by Sergeant Robert

Grey, who was in charge of the search and took part in its execution.  (See id.).
Furthermore, the Report provides a detailed factual account of events based on the
officers' personal observations, "and it is a crime [in Massachusetts] for a police officer
to file a false report."  Costa, 453 Mass. at 627, 903 N.E.2d at 1111.  Where, as here,
"[t]he police report offered a detailed factual account based on the personal observations
of the detective[,]" it carries enough indicia of reliability to enable the defendant to rely
on it.  Id.

The cases cited by the plaintiff do not compel a different conclusion.  For
example, in Basco v. Machin, 514 F.3d 1177 (11th Cir. 2008), the court questioned the
use of a police report to support a termination decision that described statements made by
a witness to police officers rather than the officers' own observations.  See id. at 1183.
Similarly, in Edgecomb v. Hous. Auth. of Vernon, 824 F. Supp. 312 (D. Conn. 1993), the
court determined that hearsay evidence contained in a police report could not form the
basis for a termination decision where "[t]he police report was based on discussions that
the affiant had overheard monitoring a wireless transmitter and provided no information
based on his firsthand observations."  Id. at 315.  Thus, "[t]he Edgecomb decision dealt
with anonymous, second-level hearsay, having no indicia of reliability[.]"  Costa, 452
Mass. at 627 n.18, 903 N.E.2d at 1110 n.18.  Here, in contrast, the Incident Report offers
first-hand observations by police officers at the scene.

Nalubega also argues that there was no substantial evidence to support the
termination decision because the record before the Conference Panels contained

29

inconsistencies regarding Monteiro's address.  (Pl. Mem. at 10).  As the plaintiff notes,

the Incident Report listed Monteiro's address as "Howard St." in Cambridge, while

Monteiro's Booking Report listed his address as "12 Harding St." in Cambridge.  (See

Def. Ex. A at 11; Def. Ex. L at 1).  However, these inconsistencies do not undermine the

defendant's decision.  Despite evidence indicating that Monteiro may have maintained

another residence, a reasonable mind could determine, based on the Booking Report and

the search of the apartment described in the Incident Report, that Monteiro was residing

in Nalubega's unit.  See Lisbon, 41 Mass. App. Ct. at 258, 670 N.E.2d at 401 (upholding

appeal board's decision where, despite evidence favoring the plaintiff's position, "it

[could not] be said that there was no evidence from which a reasonable mind could reach

a contrary conclusion" (quotations and citation omitted)).  Therefore, the Conference

Panel's decision to uphold Nalubega's termination, based on the presence of an

unauthorized occupant in her unit, was based on substantial evidence.

### **Plaintiff's Alleged Engagement in Drug-Related Criminal Activity**

The plaintiff also argues that CHA had no legal basis for terminating Nalubega's

housing benefits on the grounds that she engaged in illegal drug-related activity.  (Pl.

Mem. at 7).  This court disagrees and finds that the HUD regulations support CHA's

determination that the plaintiff engaged in drug-related criminal activity by allowing

Monteiro to occupy her apartment and engage in drug dealing from the unit.

As described above, the applicable regulations authorize PHAs administering the

Section 8 Program to terminate assistance to participants that violate any of their

30

obligations under the Program.  See 24 C.F.R. § 982.552(c)(1)(i).  Among those

obligations is the obligation not to engage in drugs crimes.  Specifically, the regulations

provide that "[t]he members of the household may not engage in drug-related criminal

activity[.]"  See 24 C.F.R. §§ 982.551(l),  "Drug-related criminal activity" is defined as

"the illegal manufacture, sale, distribution, or use of a drug, or the possession of a drug

with intent to manufacture, sell, distribute or use the drug."  24 C.F.R. § 5.100.[6]

The plaintiff argues that CHA had no basis to terminate her under these

regulations because the prohibition on drug-related criminal activity applies only to

members of a participant's household.  (Pl. Mem. at 7).  She reasons that because

Monteiro was a guest and not a member of her household, she could not be terminated on

the grounds that he was distributing drugs from her home.  (Id.).  She further notes that

the term "drug-related criminal activity" does not cover mere drug possession.  (Id.).

Therefore, she argues that there was no legal grounds for the defendant to find that she, as

opposed to Monteiro, had engaged in the proscribed conduct.

Nalubega's arguments are unpersuasive.  As an initial matter, this court finds that

CHA had legal support to conclude that Nalubega violated her Section 8 obligations by

allowing a member of her household to engage in drug-related criminal activity.  Under

the regulations, the term "household" is defined to mean "the family," which in turn is

---

[6]  The definitions section of the Section 8 regulations provide that certain terms, including
the terms "drug-related criminal activity" and "household," "are defined in part 5, subpart A of
this title."  24 C.F.R. § 982.4.  Therefore, this court must look to 24 C.F.R. § 5.100 to determine
how those terms are defined for purposes of the Section 8 Program.

defined to include "[a] group of persons residing together[.]"   See 24 C.F.R. §§ 5.100,

5.403.  The April 25, 2011 Conference Panel determined that Nalubega allowed Monteiro

to "inhabit the unit and then to deal illegal drugs from the unit."  (Def. Ex. H).  As

described above, the Conference Panel's determination that Monteiro was inhabiting the

unit was supported by substantial evidence.  Thus, although Monteiro was not

specifically authorized to live in the unit as a member of Nalubega's family, the

Conference Panel had a legally tenable basis for finding that the plaintiff was in violation

of the proscription against drug distribution by members of the participant's household.[7]

Alternatively, this court finds that there was a legal basis for the defendant to

conclude that Nalubega violated her obligations by engaging directly in the prohibited

criminal activity.  The record indicates not only that Monteiro was living with the

plaintiff, but also that he was running a drug dealing operation out of the apartment with

the knowledge and consent of the plaintiff.  The Incident Report of the police raid on the

plaintiff's apartment describes the presence of drugs and drug paraphernalia throughout

the apartment, including but not limited to, cocaine and marijuana in a bag of infant

clothing in the bedroom closet, marijuana "in plain view" in the bedroom, and drug

paraphernalia on a card table in the livingroom.  (Def. Ex. L at 2).  Moreover, it is

---

[7]  This court finds that it would make no logical sense if, as the plaintiff's argument
suggests, the regulations authorized the local housing authority to terminate benefits if a
participant knowingly  allowed another household member to engage in drug dealing, but did not
authorize termination if the participant knowingly allowed an occupant who was not an
authorized member of the family or household to engage in the same criminal activity.  This court
declines to read the regulations in such a constrained way.

undisputed that following the police raid on the apartment, both Monteiro and the plaintiff were charged with various drug-related crimes, including but not limited to, possession with intent to distribute marijuana and trafficking in cocaine.  (DF ¶ 2; PR ¶ 2).  Under the circumstances presented in the record, there was sufficient evidence to find that the plaintiff had full knowledge of, and was complicit in, an ongoing drug distribution operation.  Accordingly, the defendant had legal support for concluding that she was engaged in drug-related criminal activity within the meaning of the HUD regulations.

The fact that the Commonwealth abandoned the charges against Nalubega by filing a nolle prosequi in her criminal case does not compel a different conclusion.  It has long been the law in Massachusetts that a nolle prosequi "does not operate as an aquittal of the charge discontinued."  Commonwealth v. Rollins, 354 Mass. 630, 632, 241 N.E.2d 809, 811 (1968).  Accordingly, the nolle prosequi was insufficient to establish the plaintiff's innocence.  Furthermore, under the HUD regulations, a "PHA may terminate assistance for criminal activity by a household member . . . if the PHA determines, based on a preponderance of the evidence, that the household member has engaged in the activity, *regardless of whether the household member has been arrested or convicted for such activity*."  24 C.F.R. § 982.553(c) (emphasis added).  The description of the drug raid on Nalubega's apartment by members of the Cambridge Police Department's Special Investigations unit, combined with the description of the evidence uncovered by the police in their search, was sufficient to establish, by a preponderance of the evidence, that

33

the plaintiff was in "possession of a drug with intent to . . . sell, distribute or use the drug."  24 C.F.R. § 5.100.  Therefore, this court concludes that the defendant is entitled to summary judgment with respect to Nalubega's claim in the nature of certiorari.

### B.     Count II: Claim for Violation of Procedural Due Process

In Count II of her complaint, Nalubega has asserted a claim under 42 U.S.C. § 1983 ("Section 1983") for violations of her constitutional right to procedural due process.  In connection with this claim, Nalubega has challenged every aspect of the process provided to her by the CHA.  Despite her extensive effort to show that her constitutional rights have been infringed, this court concludes that the defendant is entitled to summary judgment on this claim as well.

### Requirements of Procedural Due Process

In Goldberg v. Kelly, 397 U.S. 254, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970), the Supreme Court held that proceedings to terminate public assistance must afford the participant the following in order to satisfy procedural due process: (1) "timely and adequate notice detailing the reasons for a proposed termination," (2) an opportunity to appear at a pre-termination hearing, to present evidence, and to confront and cross-examine witnesses, (3) an opportunity to retain counsel, (4) a decision based "solely on the legal rules and evidence adduced at the hearing", which "state[s] the reasons for [the] determination and indicate[s] the evidence [the decision maker] relied on," and (5) an impartial decision maker.  Goldberg, 397 U.S. at 266-71, 90 S. Ct. at 1019-22.  "[C]ourts have uniformly recognized that the *Goldberg* due process requirements apply in the

context of subsidized housing benefits."  <u>Anderson v. Lowell Hous. Auth.</u>, Civil Action

No. 11-10580-DPW, 2012 WL 3965112, at *10 (D. Mass. Aug. 24, 2012).  Indeed, the

"[f]ederal [HUD] regulations set out the basic procedural requirements of informal

hearings in almost literal compliance with *Goldberg*."  <u>Clark v. Alexander</u>, 85 F. 3d 146,

150 (4th Cir. 1996).  <u>See</u> <u>also</u> <u>Anderson</u>, 2012 WL 3965112, at *10-11 (describing HUD

regulations promulgated under the United States Housing Act, which "essentially codifies

the *Goldberg* criteria for hearings with respect to low-income housing benefits").

Nalubega claims that the defendant's actions failed to comport with the principles

of constitutional due process articulated in <u>Goldberg</u> and violated the hearing require-

ments set forth in the HUD regulations.  (<u>See</u> Pl. Mem. at 11-12).  This court finds, for

the reasons that follow, that the defendant adhered to its constitutional and regulatory

requirements, and that it is therefore entitled to judgment as a matter of law on Count II

of the complaint.

### <u>Adequacy of Pre-Termination Notice</u>

The plaintiff first challenges the adequacy of the Pre-Termination Notice that she

received on October 28, 2010.  She argues that the Notice was insufficient to comply with

the requirements of <u>Goldberg</u> and the HUD regulations because it was too vague to

enable her to challenge her termination, and because "it came almost *two* years after

relevant events occurred, leaving Ms. Nalubega to guess as to what events to which it

pertained."  (<u>See</u> <u>id.</u> at 12-14).  "The purpose of notice under the Due Process Clause is to

apprise the affected individual of, and permit adequate preparation for, an impending

'hearing.'" Colon v. Wagner, 462 F. Supp. 2d 162, 169 (D. Mass. 2006) (quoting Mard

v. Town of Amherst, 350 F. 3d 184, 189 (1st Cir. 2003)) (additional citation omitted).

Thus, before a PHA can terminate a family from the Section 8 Program, it must provide

the recipient with "timely and adequate notice detailing the reasons for a proposed

termination[.]" Goldberg, 397 U.S. at 267, 90 S. Ct. at 1020. See also 24 C.F.R. §

982.555(c)(2) (requiring that PHA provide family with "prompt written notice" that

"[c]ontain[s] a brief statement of reasons for the [termination] decision"). This court

finds that in this case, CHA provided the plaintiff with sufficient notice to apprise her of

the basis for the proposed termination.

Nalubega argues that CHA's Pre-Termination Notice left her unprepared to rebut

the termination because the defendant failed to include a factual statement regarding the

incident at issue and merely "put an 'X' mark in the boxes next to 'Fraud,' 'Illegal Drug

Related Activity,' 'Violent Behavior Related Activity,' and 'Illegal Occupant' and cited

to [a] broad range of regulations." (Pl. Mem. at 12-13). According to the plaintiff, it was

inappropriate for CHA to expect her to "connect the dots between the marked boxes,

multiple old police reports, and five pages of federal regulations to discern the precise

reasons for CHA's decision to terminate her benefits." (Id. at 14). Courts that have

considered the sufficiency of a written notice regarding the termination of benefits have

found notices insufficient where they do nothing more than repeat the general language of

the regulations supporting termination or fail to link the alleged violations to the

particular events at issue. See, e.g., Colon, 462 F. Supp. 2d at 166-67, 169 (ruling that

notice was  inadequate where it contained checked boxes indicating that plaintiffs failed

to comply with one or more requirements, and failed to link the details of prior warnings

they may have received months earlier with the boxes checked off in the notice); <u>Brantley</u>

<u>v. W. Valley Hous. Auth.</u>, No. 2:08CV573DAK, 2009 WL 301820, at *4-5 (D. Utah Feb.

4, 2009) (finding defendant's notices insufficient to comply with due process where basis

for housing authority's ultimate decision to terminate assistance was not the same as the

reason provided in the notices); <u>Edgecomb</u>, 824 F. Supp. at 315 ("A notice which merely

parrot[s] the broad language of the regulations is insufficient" (quotations and citation

omitted)).  Such courts have found that in order to pass muster under the Due Process

Clause, the notice should include details such as "a factual statement of the incident or

incidents which constituted the grievance," an identification as to "which family member

committed [the] proscribed acts[,]" and a statement as to the source of the housing

authority's information.  <u>Edgecomb</u>, 824 F. Supp. at 315.  <u>See</u> <u>also</u> <u>Pratt v. Hous. Auth.</u>

<u>for City of Camden</u>, Civil Action No. 05-0544 (NLH), 2006 WL 2792784, at *9 (D.N.J.

Sept. 27, 2006) (finding that notice should have identified incident which formed the

basis for the termination, the date of the relevant incident, and how the participant's

"behavior constituted any sort of criminal activity").

        In the instant case, the Pre-Termination Notice contained, in addition to the boxes

marked off with an "X," a summary stating that Nalubega had violated the Section 8

Program by "having illegal occupants in [her] unit," and by engaging in "illegal drug

related and violent behavior related activities."  (Def. Ex. A at 1).  CHA also attached

various documents to the Notice, which included a police Incident Report regarding an assault with a dangerous weapon against the plaintiff, a copy of the Incident Report from the February 27, 2009 police raid on Nalubega's apartment, and a Booking Report regarding Monteiro's arrest on February 27, 2009 and listing his address as 12 Harding Street in Cambridge.  (Def. Ex. A at 9-11, 13-14).  A review of those documents indicates that CHA considered Monteiro to be the illegal occupant, and was basing its charges of illegal drug related activity and violent behavior on the two Incident Reports and the Booking Report.  However, it is not necessary to determine whether this was sufficient or whether CHA should have provided a written statement linking each of the alleged violations with the relevant documents.

Even assuming the Pre-Termination Notice was inadequate to notify Nalubega of the basis for CHA's decision, any insufficiency was remedied by the informal meeting that the defendant held on January 25, 2011 in order "to discuss the reason for the termination and give [Nalubega] opportunity to provide any further information" that she wanted CHA to consider, and by the Summary of Informal Conference from Ms. Benzan identifying the February 27, 2009 police raid as the basis for CHA's decision to proceed with the termination.[8]  (See Def. Exs. D-E).  The Supreme Court has determined that a

---

[8]  Nalubega attempts to dispute the fact that the informal meeting took place or that she received the Summary of Informal Conference regarding the results of that meeting by claiming that she does not recall attending the meeting or receiving the letter.  (See Nalubega Aff. ¶ 20).  However, a lack of recollection is insufficient to create an issue of fact for purposes of summary judgment.  I.V. Servs. of Am. v. Inn Dev. & Mgmt., Inc., 182 F.3d 51, 55-56 (1st Cir. 1999).  Therefore, Nalubega has failed to raise a genuine dispute with respect to these facts.

system which conveys notice by a combination of a written letter and an oral conference "to inform a recipient about the precise questions raised about his continued eligibility . . . is probably the most effective method of communicating with recipients." <u>Goldberg</u>, 397 U.S. at 268, 90 S. Ct. at 1020-21.  Therefore, CHA's notice was more than sufficient to "detail[] the reasons for a proposed termination" for purposes of procedural due process.  <u>Goldberg</u>, 397 U.S. at 267, 90 S. Ct. at 1020.

With respect to the plaintiff's claim that the Pre-Termination Notice was untimely, this court finds that she has failed to show that she is entitled to summary judgment on this basis.  The undisputed evidence establishes that the incident which ultimately led to Nalubega's termination occurred on February 27, 2009, twenty months before Nalubega's receipt of the Pre-Termination Notice on October 28, 2010.  (<u>See</u> Def. Ex. A at 1; Def. Ex. L).  However, there is no evidence that the defendant was aware of the incident at the time it occurred or became aware of it within a short time thereafter.[9]  In addition, the plaintiff has not cited any authority which has held that notice is untimely if there is a delay between the time of the incident that ultimately gives rise to a termination and the time of the housing authority's notice of termination.  Under the HUD regulations, PHAs are only required to give "prompt written notice" when they make "[a] determination to terminate assistance for a participant family[.]"  24 C.F.R. §§ 982.555(a)(1)(v),

---

[9]  As described above, participants in the Section 8 Program use their vouchers to rent housing units in the private rental market.  (DF ¶ 1).  Therefore, it is unlikely that CHA would have learned about the raid on Nalubega's apartment at the time it occurred.

982.555(c)(2).  Nalubega has not presented any facts showing that there was any delay

between the time when CHA decided to terminate her housing assistance and the time it

delivered the Pre-Termination Notice.  Therefore, CHA is entitled to summary judgment

on Nalubega's claim that CHA failed to comply with the applicable notice requirements.

### Timeliness of April Conference Panel Notice

Nalubega also claims that she was deprived of due process in connection with the

first hearing before the Conference Panel on April 25, 2011 because she received notice

that the hearing would take place on April 22, 2011, only three days prior to the hearing.

(Pl. Mem. at 14-15).  She contends that such short notice not only deprived her of any

meaningful opportunity to prepare her case, but also deprived her of the ability to consult

with counsel or to make scheduling arrangements with counsel and any witnesses.  (Id.).

"The fundamental requisite of due process of law is the opportunity to be heard . . . at a

meaningful time and in a meaningful manner."  Goldberg, 397 U.S. at 267, 90 S. Ct. at

1020 (quotations and citations omitted).  Although it could be argued that the plaintiff

had ample time to review any relevant documents and gather evidence during the months

following her informal meeting with CHA on January 25, 2011, she could not have

arranged for counsel or witnesses to appear at the hearing until she was aware of the date.

Accordingly, the last minute notice of the hearing date deprived her of an opportunity to

be heard in a meaningful manner.

Nevertheless, this court finds that CHA's actions did not deprive Nalubega of her

right to procedural due process.  It is undisputed that following the conclusion of the

April 25, 2011 hearing before the first Conference Panel, Nalubega retained counsel and

requested a new hearing.  (DF ¶ 10).  It is also undisputed that CHA granted the

plaintiff's request, and scheduled a new hearing at which Nalubega was afforded an

opportunity to present whatever evidence she and her counsel deemed relevant to their

position.  (PF ¶ 51; DF ¶ 14; PF ¶ 14).  Therefore, Nalubega had a full opportunity to be

heard, and her constitutional rights were not infringed.

## Adequacy of Written Decisions

Nalubega's next challenge concerns the sufficiency of the written decisions issued

by the April 2011 and November 2011 Conference Panels.  The plaintiff argues that the

decisions failed to comply with the requirements of due process because they were not

sufficiently detailed to alert Nalubega as to the basis for the termination decision or to

allow a reviewing court to determine whether the Conference Panels fulfilled their

statutory or regulatory obligations.  (Pl. Mem. at 15-18).  This court finds that the

Conference Panel decisions satisfied the requirements of Goldberg and the HUD

regulations, and did not deprive Nalubega of her constitutional rights.

In Goldberg, the Supreme Court instructed that the hearing officer, in rendering his

conclusion regarding a recipient's eligibility for assistance, "should state the reasons for

his determination and indicate the evidence he relied on[.]"  Goldberg, 397 U.S. at 271,

90 S. Ct. at 1022.  However, it emphasized that the decision "need not amount to a full

opinion or even formal findings of fact and conclusions of law."  Id.  Under the HUD

regulations addressing the hearing officer's decision,

41

> [t]he person who conducts the hearing must issue a written decision,
> stating briefly the reasons for the decision.  Factual determinations
> relating to the individual circumstances of the family shall be based
> on a preponderance of the evidence presented at the hearing.  A copy
> of the hearing decision shall be furnished promptly to the family.

24 C.F.R. §§ 982.555(e)(6).

Courts evaluating the sufficiency of a written decision in a Section 8 termination proceeding have also been guided by the reasoning provided by HUD in connection with the adoption of its Final Rule concerning the requirements for termination hearings.  See Lawrence v. Town of Brookhaven Dep't of Hous. Cmty. Dev. & Intergovernmental Affairs, No. 07-CV-2243 (JS), 2007 WL 4591845, at *16 (E.D.N.Y. Dec. 26, 2007); Anderson, 2012 WL 3965112, at *18.  As HUD stated,

> [t]he statement of the decision required by the regulation tells the
> participant what was decided, and the reasons for the decision.  A
> requirement for a legalistic statement of evidentiary and legal
> grounds for the decision would add little of benefit to the participant.
> The character of the decision is not more informative or comforting
> to the participant when stated as an enumeration of "evidentiary" and
> "legal" grounds.
>
> The statement of decision required by the regulation must be truly
> informative as to the reasons for the decision.  *This would include a
> short statement of the elements of fact or law on which the decision
> is actually based.*  A bare and conclusory statement of the hearing
> decision, that does not let the participant know the basic reasons for
> the decision, will not satisfy the regulatory requirement.

Lawrence, 2007 WL 4591845, at *16 (quoting Section 8 Housing Assistance Payments Program; Existing Housing, 49 Fed. Reg. 12215, 12230 (March 29, 1984)) (emphasis added).

42

This court finds that the decisions of the Conference Panels in this case complied with the applicable standard.  As described above, the April 25, 2011 Conference Panel decision stated that "[t]he basis for the termination was the fact that the Housing Choice Voucher holder allowed an unauthorized guest to inhabit the unit and then to deal illegal drugs from the unit."  (Def. Ex. H).  It also noted that the unit was raided by the Cambridge police, whose records revealed "extensive drug and paraphernalia possession."  (Id.).  Furthermore, the decision emphasized that the police report of the search of Nalubega's apartment revealed the presence of mail listing her boyfriend's name and Nalubega's address.  (Id.).  Thus, the Panel provided a short statement explaining the reasons for its decision and the evidence on which it was based.  This was sufficient to satisfy the requirements of due process.[10]  See Goldberg, 397 U.S. at 271, 90 S. Ct. at 1022 ("the decision maker should state the reasons for his determination and indicate the evidence he relied on"); Lawrence, 2007 WL 4591845, at *16 (explaining that decision should "include a short statement of the elements of fact or law on which the decision is actually based" (quoting 49 Fed. Reg. 12215, 12230 (March 29, 1984)).

---

[10]  The plaintiff argues that the April 2011 Conference Panel's decision left it up to her and the court to "guess at which one or two or more of the *four* bases of termination in the original staff decision" the decision upheld.  (Pl. Mem. at 16).  This court disagrees.  As Ms. Benzan stated in the January 25, 2011 Summary of Informal Conference, CHA staff decided to terminate the plaintiff, based on the incident that occurred on February 27, 2009, because she "engaged [i]n criminal activity of a drug related nature and also had an illegal occupant residing with [her] that engaged in criminal activity up to possession and distribution of illegal substances."  (Def. Ex. E).  A reading of the April 2011 Conference Panel's decision indicates that it was upholding the termination decision on this same basis.

The November 16, 2011 Conference Panel decision essentially re-affirmed the decision rendered by the earlier Panel.  In its decision, the November 2011 Conference Panel explained that a rehearing was granted based on a claim that Nalubega was not represented by counsel at the original hearing.  (Def. Ex. J).  However, it further stated that the only new evidence presented by the plaintiff at the second hearing was the testimony of two friends who described Nalubega's good character.  (Id.).  Moreover, the Panel acknowledged that Nalubega "repeated her protestations that she did not know that Mr. Monteiro, the father of her only child, was convicted of dealing drugs out of her apartment, based upon drugs and paraphernalia found in the apartment and seized by the police[,]" but it stated that it did not believe her testimony at the prior hearing and did not believe it the second time either.  (Id.).  Thus, the second Conference Panel did not alter the prior Conference Panel's determination that Nalubega was being terminated because she knowingly allowed an unauthorized individual to reside in her apartment and to engage in drug dealing from her unit.  It merely explained why a second hearing was held and why the Panel had not been persuaded after the second hearing to reinstate Nalubega's benefits.  Because  the Conference Panel decisions were adequate to apprise Nalubega, as well as a reviewing court, as to the reasons for the plaintiff's termination, CHA is entitled to judgment as a matter of law on this issue.

Nalubega's arguments that the decisions were inadequate because they did not cite to specific regulations or provisions of the 1998 Plan are without merit.  (See Pl. Mem. at 16-17).  The law "does not require that the decisionmaker include in his decision the

exact provisions violated." Lawrence, 2007 WL 4591845, at *16. See also Anderson, 2012 WL 3965112, at *18 (rejecting plaintiff's argument that decision was inadequate because it failed to include cites to rules or regulations). Similarly, the plaintiff's assertion that the April decision violated due process because it failed to state "whether the decision is based on a preponderance of evidence, whether the panel even considered mitigating evidence such as exculpatory evidence of the *nolle prosequi*, or the impact of termination on [Nalubega's] 'young child[,]'" lacks support in the case law or in the regulations. (See Pl. Mem. at 16). "Goldberg holds that the written decision 'need not amount to a full opinion or even formal findings of fact and conclusions of law.'" Anderson, 2012 WL 3965112, at *18 (quoting Goldberg, 397 U.S. at 271, 90 S. Ct. at 1022). Requiring the hearing officer to "explicitly state the standard of proof" or describe all of the evidence considered in rendering his decision "is inconsistent with Goldberg's refusal to require a full judicial opinion." Id. Furthermore, this court rejects the plaintiff's contention that the April decision failed to meet due process standards because CHA improperly relied on the police report's description of documents found in Nalubega's apartment. (See Pl. Mem. at 16). A housing agency's reliance on hearsay to support a termination decision does not constitute a violation of due process, at least where, as here, the "evidence contains substantial indicia of reliability." Costa, 453 Mass. at 627, 903 N.E.2d at 1110. See also Gammons, 502 F. Supp. 2d at 165 (finding that "the admission of hearsay statements as evidence [in Section 8 termination hearing] is not problematic" and does not violate due process).

45

Finally, this court does not agree with the plaintiff's argument that the November Conference Panel decision was inadequate because it did not specify whether the second hearing was intended as a "*de novo* review, a redo, or a continuation of the April hearing" so that the plaintiff and the court could understand "what legal standards, if any, apply to CHA's second decision."  (Pl. Mem. at 18).  Nothing in <u>Goldberg</u> or in the HUD regulations supports any such requirement, and the plaintiff has not cited any authority to support her assertion.  In any event, no such detail is necessary in order to understand the basis for the Conference Panel's decision, which is all that is necessary to satisfy procedural due process.

### Impartiality of the Conference Panel

The plaintiff's final due process challenge to the hearing process concerns Gerard Clark's participation on both the April and November Conference Panels.  Nalubega claims that Chairman Clark's presence on both Panels, and the fact that he approved and authored the April Conference Panel decision, which was under review by the November Conference Panel, deprived her of her right to an impartial decision maker.  (Pl. Mem. at 19).  Again, Nalubega's arguments are unconvincing.

Pursuant to the HUD regulations, Section 8 termination hearings "may be conducted by any person or persons designated by the PHA, other than a person who made or approved the decision under review or a subordinate of this person."  24 C.F.R. § 982.555(e)(4)(I).  Similarly, <u>Goldberg</u> holds that "an impartial decision maker is essential" to due process, and that while "prior involvement in some aspects of a case will

46

not necessarily bar a[n] . . . official from acting as a decision maker[,]" the official must not "have participated in making the determination under review."  Goldberg, 397 U.S. at 271, 90 S. Ct. at 1022.  Although Chairman Clark participated in both the April and November 2011 Conference Panels, the record demonstrates that he did not make or approve the decision that was under review.

The undisputed facts establish that the initial decision to terminate Nalubega's participation in the Section 8 Program was made by Yuen Ting Tang-Wu, CHA's Deputy Director of Leased Housing.  (DF ¶ 14; PR ¶ 14).  They also establish that Angelica Benzan, CHA's Director of Leased Housing, was the individual who confirmed the staff's intent to proceed with the termination following her informal meeting with the plaintiff on January 25, 2011.  (Def. Ex. E).  Accordingly, the record shows that Chairman Clark was not involved in the staff decision that was under review by the Conference Panels hearing Nalubega's appeal.

The plaintiff's assertion that the second Conference Panel conducted a "review" of the April Conference Panel's decision is inconsistent with the undisputed evidence of the appeal proceedings.  That evidence shows that the April 2011 Conference Panel was convened for purposes of hearing Nalubega's "appeal of a staff decision terminating a Housing Choice Voucher" and that following a hearing, the April Conference Panel decided to affirm the staff decision.  (Def. Ex. H).  The evidence further shows that the November 2011 Conference Panel was convened for the purpose of "re-hearing . . . the appeal of the termination" in light of Nalubega's claim that she was not represented by

47

counsel at the prior hearing, and that following the second hearing, the November

Conference Panel decided to "re-affirm[]" the decision.  (Def. Ex. J).  The record thus

establishes that Chairman Clark was not reviewing the decision he wrote when he

participated in the initial hearing.  Instead, he was revisiting the CHA staff's decision

based on the evidence presented at the second hearing.  Therefore, Chairman Clark's

presence on both Conference Panels did not deprive Nalubega of her right to an impartial

decision maker.

The plaintiff's claim that Chairman Clark was biased is also undermined by the

lack of any evidence that she objected to his presence on the Conference Panel at the time

of the second hearing.  The 1998 Plan provided that "[i]f any member of the panel has

had prior dealings with a particular case or the grieving party, the grieving party may

request that that panel member be replaced."  (Pl. Ex. 4 at 22).  To the extent Nalubega

believed Chairman Clark's presence on the November Conference Panel was improper or

unfair, she could have sought relief.  Her apparent failure to do so further convinces this

court that no due process violation occurred, and that CHA is entitled to summary

judgment on Count II of the plaintiff's complaint.

## IV.  CONCLUSION

For all the reasons detailed herein, "Plaintiff Angelic Nalubega's Motion for

Summary Judgment" (Docket No. 29) is DENIED and the "Defendant's Motion for

Summary Judgment" (Docket No. 30) is ALLOWED.

_____/ s / Judith Gail Dein_____

Judith Gail Dein
United States Magistrate Judge